**1022**

J. F. Jackson, Asst. Dist. Atty., of San Antonio, Tex., for relator.

Leonard Brown and Russell Wine, both of San Antonio, Tex., for defendant.

**WEST, District Judge.**

Habeas corpus sought by relator, Abeldano, on the ground that his detention for deportation to Mexico by immigration officers, charging him by warrant with "sharing in and deriving benefit from the earnings of a prostitute, and assisting said prostitute" subsequent to his last entry from Mexico, August 21, 1931. Immigration Act 1917, § 19; 8 USCA § 155.

 Abeldano, also known as Ramirez, his mother's family name, is unmarried. Born in Mexico June, 1904. He lawfully entered the United States as an infant of three years of age with his mother and remained in Texas until 1922. He visited Mexico for ten months, returning to the United States and San Antonio, Tex., his place of residence in 1923. He also made a short visit to Mexico and re-entered August 21, 1931, at Eagle Pass, Tex. He has no criminal record, though admits arrest by city police in 1929 and fined. He has been continuously employed and for a year last past as truck driver for the National Biscuit Company.

The government's witness, Estafana Ramirez, Texas born, a prostitute, lived with relator for about ten months. His mother and four sisters, all born in Texas, live in San Antonio. He reads and speaks English. Relator and the woman spent their earnings mostly for joint living expenses; she contributing $10 or $12 a week and, in addition, helped her own family. The automobile was bought and paid for from joint earnings. Relator drove it to the place where Estafana practiced prostitution and to other places she wished to go. Bills and room rent were paid from their common earnings. He did not live with the prostitute at the place where she carries on her trade, nor did he participate or benefit by her earnings except indirectly in jointly contributing to the payment of the rent of a living room jointly occupied by them.

Her place of business was at the house of prostitution where she sold herself to men for a price. The relations between Abeldano and the woman were personal and private, not public. The case was brought to the attention of immigration officers through the quarrel between the relator and the government's witness, Estafana, thus using the government to punish him for asserted wrongs already condoned. The law thus to serve as a means of revenge for the prostitute rather than that justice might be done. The effect of deportation to the relator is banishment from this, his country, after twenty-five years residence.

The Immigration Act in question does not apply or extend to circumstances where the relations of the alien with prostitutes or places of prostitution are personal and private as distinguished from public, and further are not connected with the promotion of the trade or business of prostitution as such. Nagle v. Eizaguirre (C. C. A.) 41 F.(2d) 735; Louros v. Lindsey, Immigration. Inspector (D. C.) 51 F.(2d) 303.

The court further finds and concludes from the foregoing that the relator did not have a fair hearing by the immigration officers.

It results, therefore, from the foregoing that the writ of habeas corpus should be and is granted and the relator, Abeldano, should be and is discharged from custody of immigration officers who hold him under warrant of deportation.

**In re HALL.**

No. 22481.

District Court, W. D. New York.

Sept. 9, 1935.

VanVlack & Bargar, of Jamestown, N. Y., for bankrupt.

John E. Durkin, of Jamestown, N. Y., for superintendent of banks of New York, creditor.

KNIGHT, District Judge.

Objections were filed on the application for discharge. These were referred to the referee in bankruptcy as special master. The special master has filed his opinion recommending the granting of a discharge and has made certain findings of fact and conclusions of law. Exceptions were filed to such findings. The bankrupt now moves to confirm the master's report. I do not see how this report can be sustained.

It seems clear from the evidence that on December 8, 1928, the bankrupt "obtained money, * * * on credit * * * by making or publishing * * * a materially false statement in writing respecting his financial condition." Under such circumstances, his discharge cannot be granted. Section 14b (3), Bankruptcy Act of 1898, as amended by Act May 27, 1926, 11 USCA § 32 (b) (3).

The referee in his opinion states: "The Bankrupt made a financial statement in writing that on its face was and is false to such a degree that if credit was extended to him in any form, in reliance thereon, the discharge applied for should be denied." That the statement made was false cannot successfully be contradicted. The referee states in his opinion with reference to the time when this statement was made: "It is dated December 8, 1928, and it probably was made the day it was dated."

The weight of the evidence shows that it was dated and given on that day, and there is no denial that the bankrupt did not own the property set forth in the statement. Although the referee states in his opinion that it probably was made on December 8, 1928, and that it was "a financial statement in writing that on its face was and is false," yet he finds (finding 21) that bankrupt did not execute a false statement "on the 8th day of December, 1928, or upon any date in the month of December." This finding, it seems to me, is inconsistent with the opinion and not warranted by the evidence.

It is not material whether credit was obtained for the bankrupt. Credit was obtained for another by the indorsement of a note by the bankrupt. The statute said nothing about credit to the bankrupt. Its purpose and meaning are met by construing "credit" as referring to credit obtained by the bankrupt for himself or for another. However, the evidence is sufficient to warrant the conclusion that the bankrupt obtained credit for himself. While there is some conflict in the testimony with reference to what was done with the note executed by bankrupt, the note was given by the bankrupt as the maker, made payable to the Sinclairville State Bank, and the records of the bank show that the amount of this note was deposited to the credit of the bankrupt on December 10, 1928. Subsequent to that the proceeds were applied upon indebtedness of third party. Without doubt the note was intended to be given for the benefit of the third party. Its purpose can hardly be denied. The acts done, however, show that bankrupt first obtained credit for the note.

The court makes its ruling upon the exceptions as follows:

Ninth. Exception allowed.
Tenth. Exception overruled.
Eleventh. Exception overruled.
Thirteenth. Exception allowed.
Fourteenth. Exception allowed.
Fifteenth. Exception overruled.
Seventeenth. Exception overruled.
Eighteenth. Exception overruled.
Nineteenth. Exception allowed.
Twentieth. Exception allowed.
Twenty-first. Exception allowed.

### Conclusions of Law

First. Exception allowed.
Second. Exception allowed.
Third. Exception allowed.